DECISION
This is an appeal by defendant, Michael D. Conley, from a judgment of sentence and conviction entered by the Franklin County Court of Common Pleas following a jury trial in which defendant was found guilty of robbery and aggravated robbery.
On June 20, 1996, defendant was indicted on one count of aggravated robbery, in violation of R.C. 2911.01, and one count of robbery in violation of R.C. 2911.02. The alleged victim under both counts of the indictment was Calandra Robinson.
The case came for trial before a jury beginning on February 6, 1997. Calandra Robinson testified that on June 6, 1996, she went to the Agler Market carrying a large sum of money (approximately $4,700). According to Robinson, the money was from a settlement in a civil suit involving Robinson's cousin, Claude Nelms, an inmate at the Pickaway Correctional Institution. Robinson had a power of attorney to ensure that the money was distributed to Nelms' children.
Robinson testified that she drove to the Agler Market to purchase beer for her husband. She gave the following testimony regarding the events on that date. After arriving at the market, Robinson parked her vehicle near a dumpster. Robinson was an acquaintance of the defendant, and when she arrived at the market she observed the defendant and another man in a car in the parking lot of the market.
Robinson got out of her car, and the defendant called out Robinson's name. Robinson turned around and the defendant and another man, Kenny Wilson, were standing behind her. Robinson did not know Wilson at the time. The defendant said to Robinson, "hey, what's going on? What's happening?" (Tr. 65.) Robinson responded, "nothing. Going to the store to get some beer." (Tr. 65.) The defendant said, "all right then." (Tr. 65.)
As Robinson turned away, Wilson grabbed her and pulled her back near the dumpster. Wilson put a gun beside Robinson's neck and he started going through her pockets. The defendant walked toward the front of the store and, according to Robinson, "looked out." (Tr. 66.) Robinson related that the defendant "was looking like making sure nobody was looking, just looking, just looking around." (Tr. 66.) Robinson asked the defendant, "why are you doing this to me, I thought we was friends, why are you robbing me." The defendant responded, "I don't have nothing to do with it. I don't have nothing to do with it." (Tr. 67.) The defendant further remarked, "that's your boy behind you." (Tr. 67.) Robinson pleaded for help and told defendant that the man was hurting her, but the defendant "just laughed." (Tr. 67.)
Wilson took the money and other items from Robinson's pocket, and he then got into the car and said to the defendant, "Dion, come on." (Tr. 69.) Robinson looked at the defendant and the defendant "just laughed and said, `I'll get your money back. I'll get your money back.'" (Tr. 69.) The defendant got into the car with Wilson and they left the scene.
Robinson then got into her car and began to chase Wilson's vehicle. As Robinson pursued the car, Wilson began shooting at Robinson's vehicle. During this time, the defendant "just slid down in the seat * * * like nothing was happening." (Tr. 70.) Robinson's vehicle struck the back of Wilson's car during the chase. Wilson subsequently stopped his vehicle. Wilson exited the vehicle and "waved the gun in my face, saying, `get out of here.'" (Tr. 71.) At this time, the defendant was checking Wilson's vehicle to "see what damage I had done to the car." (Tr. 72.) Wilson started firing shots toward the back of Robinson's car.
Robinson sped away, but she later saw Wilson's vehicle parked near a stop sign. Robinson attempted to ram her vehicle into the front of Wilson's car, but Wilson was able to shoot out a front tire on Robinson's vehicle, causing Robinson's vehicle to hit a fence.
Following the incident, Robinson spoke with Columbus Police Detective Ron Lanning. Robinson picked out defendant's photograph from an array compiled by the detective.
Approximately three or four days after the incident, Robinson was driving on a neighborhood street when she observed Wilson. Wilson "pulled out his gun and said someone set it up." (Tr. 77-78.) Robinson wrote down the license number of Wilson's vehicle and contacted Detective Lanning. Robinson subsequently picked out Wilson's photograph from an array.
Robinson testified that the defendant later phoned her residence. Robinson answered and gave the phone to her husband. The defendant told Robinson's husband, "it wasn't his fault." (Tr. 81.)
Eric Robinson, the husband of Calandra Robinson, testified that approximately two or three months after the incident he received a phone call from the defendant. The defendant "said that he would give half the money back, like $2,500 back, if we would drop the charges." (Tr. 112.) Robinson told the defendant "there was no way that my wife couldn't testify." (Tr. 112.)
The defendant testified on his own behalf. The defendant stated that he and Calandra Robinson have been friends in the past. The defendant gave the following account of the events on June 6, 1996. On that date, the defendant was on Grasmere Street when he saw an acquaintance, Kenny Wilson. Wilson stated that he was "on his way to meet up with Calandra." (Tr. 187.) Wilson asked defendant if he would like to ride over to the store with him.
Wilson and the defendant drove to the Agler Market. Wilson drove up to a phone booth and phoned Robinson's residence. After confirming that Robinson was on her way, Wilson pulled into a parking space.
The defendant then went into the store by himself. When he came back outside, he observed Robinson's car parked near Wilson's vehicle. Robinson and Wilson were arguing. Robinson was "saying that he owed her some money and this and that, and he's saying something about he don't owe her nothing because she did * * * him wrong on a deal or whatever." (Tr. 190.) Robinson then started "hollering" at the defendant. (Tr. 190.) The defendant "didn't know exactly what was going on, but I had an inference that it was probably she gave him some drugs or something, and he didn't pay her the money, or something went wrong pertaining to something illegal or whatever." (Tr. 191.) The defendant told her that he "wasn't' going to be a part of it." (Tr. 191.)
Wilson then got inside his car and told defendant to "come on." (Tr. 191.) The defendant got into the car and Wilson drove away. Wilson and the defendant traveled approximately one block when Robinson sped up behind them and started ramming Wilson's car. Some of the windows in Wilson's vehicle were broken. The defendant "didn't know if it was gunfire from her car or him pulling the gun up from under his seat or whatever shooting back at her over his — he was driving, and he was trying to shoot out his window, I guess, back at her." (Tr. 192-193.)
Robinson continued to pursue Wilson's vehicle. Wilson drove through some alleys and came to a stop on Blake. At that time, Robinson "tried to drive head on into the driver's side door of his car." (Tr. 193.) Wilson "backed * * * up real fast," and Robinson hit a pole and a fence. Wilson then sped around Robinson's vehicle and left the area.
The defendant stated that, after the incident, he talked to Robinson's husband on the telephone. The defendant "told him that I wouldn't want to talk about my case over the phone. I wouldn't want to pay him for something I didn't have nothing to do with." (Tr. 197.)
Following deliberations, the jury returned verdicts finding defendant guilty of both counts of the indictment. The trial court sentenced defendant by entry filed on February 19, 1997. The trial court filed a corrected entry on February 2, 1998.
By journal entry filed June 30, 1999, this court granted defendant leave to file a delayed appeal. On appeal, defendant sets forth the following three assignments of error for review:
 FIRST ASSIGNMENT OF ERROR Appellant was denied effective assistance of counsel as guaranteed under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.
 SECOND ASSIGNMENT OF ERROR The trial court erred in excluding testimony from a defense witness who overheard statements by a prosecution witness that were inconsistent with the witness' in-court testimony.
 THIRD ASSIGNMENT OF ERROR The verdict of the jury was against the manifest weight of the evidence.
Under his first assignment of error, defendant contends that he was denied effective assistance of counsel. Specifically, defendant argues that during defense counsel's cross-examination of the alleged victim, Calandra Robinson, the witness was allowed to present a lengthy, emotional statement to the jury in which she verbally attacked the defendant for his conduct. Defendant argues that his trial counsel's failure to interrupt, object, or move to strike Robinson's testimony allowed the jury to hear remarks that engendered sympathy for the witness and inflamed passions against the defendant.
The standard to be applied in addressing a claim of ineffective assistance of counsel is set forth in Strickland v.Washington (1984), 104 S.Ct. 2052. Under Strickland, a defendant is required to show: (1) that his counsel's representation fell below an objective standard of reasonableness; and (2) the probability that, but for counsel's errors, the result of the proceeding would have been different. Id. at 2064, 2068. See, also, State v. Bradley (1989), 42 Ohio St.3d 136, paragraphs two and three of the syllabus.
In support of his claim of ineffective assistance of trial counsel, defendant cites to approximately four and one half pages of transcript involving the cross-examination of Calandra Robinson by defense counsel. At issue is the following exchange between counsel and Robinson, prompted by counsel's questioning of the witness about her actions shortly after her failed attempt to pursue Wilson's vehicle:
 Q. [DEFENSE COUNSEL]: SO AT THAT POINT IN TIME, YOU FIGURED NOW'S THE TIME TO GET THE POLICE INVOLVED. IS THAT RIGHT?
 A. I MEAN, WHEN CAN I STOP ON THE WAY TO CALL THE POLICE? I WOULD HAVE LOST WHERE THEY WAS GOING. I WOULD HAVE LOST SIGHT. COULDN'T GET MY MIND FOCUSED ON THE LICENSE PLATE. IF I WOULD HAVE STOPPED AND CALLED THE POLICE, THEN I WOULDN'T HAVE KNOWN WHERE THE HELL THEY WENT. I WOULD HAVE BEEN LOST.
 I MEAN, I'M LOST NOW BECAUSE I DON'T GET ANY OF THE MONEY BACK, BUT I'M REALLY LOST BECAUSE I WOULDN'T HAVE KNOWN WHERE THEY WENT. I WOULDN'T HAVE HAD NO WITNESSES TO SAY THIS MAN DID THIS OR THAT MAN DID THAT. SO, THEREFORE, YES, I DID CHASE THEM BECAUSE I WANTED TO GET SOMETHING BACK THAT DIDN'T BELONG TO THEM. I COULD HAVE LOST MY LIFE IN THAT WHOLE SITUATION.
Q. I'M NOT CRITICIZING YOU.
 A. I'M JUST SAYING, IN ALL DUE RESPECT TO YOU, YOU SHOULD CRITICIZE DION FOR SAYING — WHY DIDN'T DION HELP ME? WHY DID DION JUST LAUGH AND GET RIGHT BACK IN THE CAR WITH THIS MAN WITH A GUN AND JUST RIDE OFF? YOU KNOW WHAT I'M SAYING? IF DION HAD NOTHING TO DO WITH IT, HE SHOULD HAVE STAYED THERE WITH ME AND CALLED THE POLICE. HE SHOULD HAVE WENT ELSEWHERE BESIDES GETTING BACK IN THE SAME CAR WITH THIS ROBBER MAN. IF HE HAD NOTHING TO DO WITH IT, DON'T GET BACK IN THE CAR WITH SOMEBODY WHO'S GOING TO ROB YOU OR SOMEBODY WHO JUST GOT DONE ROBBING SOMEBODY. THAT'S STUPID.
 IF I ROB SOMEBODY — IF I'M WITH SOMEBODY WHO ROBS SOMEBODY, I'M NOT GOING TO GET BACK IN THE CAR WITH SOMEBODY. THAT'S STUPID. LET'S SAY I'M DOWN WITH SOMEONE WHO ARE ROBBING PEOPLE. YOU DON'T GET BACK IN THE CAR WHEN SOMEBODY JUST ROBBED SOMEBODY. YOU DON'T GET IN THE CAR WITH SOMEBODY WITH A GUN. THOSE ARE THINGS YOU DON'T DO. THAT'S COMMON SENSE. YOU TEACH THEM AS A CHILD TO GROW UP TO LEARN THAT.
 I WOULD TEACH MY CHILD, YOUR FRIEND HAS A GUN, GET AWAY FROM THAT. THAT'S WHY THE WORLD IS LIKE THAT. YOU'RE DOWN WITH PEOPLE WITH GUNS, YOU GET IN THE CAR WITH THEM, YOU RIDE WITH THEM, TO ME, THAT'S APPROVING IT. ALL YOU'RE DOING IS APPROVING WHAT YOUR FRIEND JUST DID JUST BECAUSE YOU DIDN'T HELP ME. YOU DIDN'T — YOU'RE NOT TURNING STATE'S EVIDENCE ON YOUR FRIEND. YOU'RE NOT DOING ANYTHING. ALL YOU'RE DOING IS TRYING TO GET OUT OF THE SITUATION. CALLING ME, HARASSING ME. YOU KNOW WHAT I'M SAYING? DO SOMETHING ABOUT IT. THINK BACK BEFORE YOU DO THESE STUPID THINGS. YOU KNOW WHAT I'M SAYING.
 AND THE BIGGEST PROBLEM I HAD WITH DION, YOU KNOW WHAT I'M SAYING, THE BIGGEST PROBLEM, HE DIDN'T HELP ME. HE DIDN'T HELP ME. HE SHOULD NOT HAVE GOT BACK IN THE CAR WITH KENNY AND SAID, "CALANDRA, COME ON, LET'S GO CALL THE POLICE." PAY PHONE RIGHT BY THE CORNER STORE, THREE OF THEM, AGLER MARKET. "LET'S GO CALL THE POLICE. LET'S GET THIS TAKEN CARE OF. I HAD NOTHING TO DO WITH THIS. I'M LETTING YOU KNOW STRAIGHT UP SO I WON'T GET IN TROUBLE. I HAD NOTHING TO DO WITH IT." HE NEVER WENT TO ME.
 THE WHOLE TIME HE WAS IN JAIL, "IT WASN'T ME. IT WASN'T ME." YOU THINK I WANT TO HEAR THAT AFTER I GOT A MARK ON MY NECK FROM HIS FRIEND? NOT MY FRIEND. HIS FRIEND. I DON'T CALL HIM BEING MY FRIEND, BUT HIS FRIEND PUTS BRUISES AND A GUN IN MY NECK. I MEAN, JUST ONE INSTANT THAT GUN COULD HAVE WENT OFF, AND I WOULDN'T EVEN HAVE BEEN HERE, OR I COULD BE PARALYZED, NO NECK, ANYTHING. JUST ONE INCIDENT.
 DION WOULD HAVE THOUGHT, "DON'T GET BACK IN THE CAR WITH KENNY. I'M GOING TO HELP THIS GIRL SO SHE WOULD KNOW THAT I HAD NOTHING TO DO WITH THIS." RIGHT NOW I'M THANKING HE HAD SET IT UP. HE PLANNED IT. YOU KNOW WHAT I'M SAYING? ANYTHING, ANYTHING COULD HAVE HAPPENED.
 THIS MAN SHOULD HAVE BEEN A MAN AND SAID, "KENNY, YOU WRONG," AND NOT GOT BACK IN THE CAR. THAT'S THE ONLY THING I FAULT DION FOR. HE COULD HAVE HELPED ME PERIOD. HE COULD HAVE HELPED ME INSTEAD OF RIDING OFF WITH THE ROBBER. SO DION WAS PART OF THE ROBBERY BECAUSE HE WAS WITH HIM. HE RODE OFF WITH HIM. THE WHOLE TIME HE WAS SHOOTING HE COULD HAVE JUMPED OUT OF THE CAR WHILE THE DUDE WAS SHOOTING. HE WAS WITH HIM. ALL HE DID WAS SLIDE DOWN.
 WHAT IF I WAS DEAD RIGHT NOW? NOTHING. YOU COULDN'T SAY NOTHING. YOU SAY, "OH, MY FAULT." WHAT WOULD YOU HAVE TOLD MY TWO CHILDREN? NOTHING. YOU WOULD HAVE BEEN, "I DIDN'T DO IT." THAT'S ALL YOU KEEP SAYING IS, "I DIDN'T DO IT." BUT YOU HAD SOME PARTS IN IT BECAUSE YOU WAS WITH KENNY. YOU SHOULD HAVE LEFT KENNY. THE WHOLE TIME YOU SHOULD HAVE LEFT, JUMPED OUT OF THE CAR, DO WHAT YOU HAVE TO DO TO GET YOURSELF OUT OF TROUBLE. THAT'S WHAT I WOULD HAVE DID.
 IF I'M WITH MR. DEVILLERS, HE ROBBED SOMEBODY, I'M NOT GOING TO GET IN THE CAR WITH HIM. I'M NOT A DUMMY. I'M JUST NOT GOING TO GET IN THE CAR WITH HIM. YOU GO AHEAD. YOU GO TO JAIL. YOU DO YOUR TIME. YOU CAN SAY I WAS WITH YOU, WHATEVER. YOU CAN ROLL OVER ME WHILE I'M JUMPING OUT OF THE CAR. I'M NOT RIDING WITH YOU. WHAT YOU DID WAS WRONG. YOU COULD HAVE KILLED THAT WOMAN.
 [ASSISTANT PROSECUTING ATTORNEY] * * *: YOUR HONOR, MAY WE APPROACH REAL QUICK?
THE COURT: YES.
 THEREUPON, A DISCUSSION WAS HELD OFF THE RECORD AT THE BENCH OUT OF THE HEARING OF THE JURY.
Q. [DEFENSE COUNSEL] * * *. I WAS ACTUALLY ASKING YOU —
 A. I KNOW. I'M SORRY FOR DOING THAT. I MEAN, YOU JUDGES DON'T UNDERSTAND THE SITUATION I'M IN. YOU KNOW WHAT I'M SAYING? SOMEONE DID ALL THIS TO YOU, I'M SURE YOU WOULD NOT BE CALM ABOUT THE SITUATION. THIS MAN WAS SITTING RIGHT HERE IN MY FACE. THE MAN CALLED ME THE WHOLE TIME HE WAS IN PRISON. JUST THINK ABOUT THINGS BEFORE YOU DO THINGS.
THE COURT: ALL RIGHT. QUESTIONS?
 Q. [DEFENSE COUNSEL]: AND REALLY I'M NOT TRYING TO UPSET YOU.
 A. THAT'S YOUR JOB. I UNDERSTAND. I UNDERSTAND. BUT I'M JUST UPSET. THIS MAN IS SITTING RIGHT HERE, AND I HAVE TO SIT HERE IN THE SAME ROOM WITH HIM, YOU KNOW.
(Tr. 94-99.)
Upon review, we agree with defendant's contention that his trial counsel was deficient in failing to object to the testimony cited above. The transcript indicates that the witness was permitted to give a lengthy, essentially uninterrupted narrative in which she expressed her personal views regarding the crime and the defendant's guilt. Significantly, we note that it was the assistant prosecuting attorney, rather than defense counsel, who finally interrupted this narrative by asking to approach the bench during the proceedings. Prior to the prosecutor's action, the witness gave her personal views on what an innocent person would have done under the circumstances, speculated that defendant set up the robbery, and described her fear that she could have been killed because of defendant's failure to assist her. Further, the witness told the jury about matters that may have otherwise remained outside the record, including the fact that defendant called her from jail and that defendant declined to cooperate in prosecuting Wilson. The witness also delivered an emotional outburst in which she complained about having to sit in the same room with the defendant. Because most of the matters discussed during the narrative were irrelevant to issues before the jury, and thus would have been ruled inadmissible upon objection by counsel, we find that trial counsel's performance was deficient in failing to raise an objection.
We further conclude that defendant was prejudiced by counsel's failure to object. In the present case, evidence regarding the defendant's alleged participation in the robbery came primarily from two witnesses, the victim and the defendant. Due to counsel's failure to object, the jury heard Robinson make irrelevant, inflammatory references to the defendant, disparaging his credibility. The witness was also permitted to offer what was essentially her own opinion testimony as to defendant's guilt or innocence. Further, although a trial court would normally be vested with wide discretion in dealing with emotional outbursts or the introduction of extraneous or inadmissible evidence, trial counsel did not request any type of limiting instructions in this case. As a result, the trial court did not admonish the jury to disregard the comments in an effort to remove any prejudicial effect. We further note that this is not a case in which the evidence was overwhelming against the defendant. The state attempted to show complicity based on a theory that defendant acted as a lookout for the principal, Wilson. While the defendant was present at the scene, there was testimony by the victim herself that defendant disavowed any role in the robbery at the time and that he told her that he would get her money back. We conclude that defense counsel's failure to object, thereby allowing the witness to express her antagonism toward defendant, offer her personal views of the evidence, speculate about defendant's motives, emphasize her plight during the incident, and relate that defendant withheld information, was prejudicial to defendant's right to a fair trial.
Accordingly, we sustain defendant's first assignment of error.
Although our resolution of the first assignment of error is dispositive of this appeal, defendant's second assignment of error presents an issue that may arise on retrial. Accordingly, we will also consider this assignment of error.
Under the second assignment of error, defendant asserts that the trial court erred in excluding the testimony of a defense witness who allegedly overheard statements by a prosecution witness that were inconsistent with the witness's in-court testimony. Specifically, defendant notes that Calandra Robinson's husband, Eric Robinson, testified at trial that defendant called him at home following the robbery and offered to return his share of the money if Calandra Robinson would agree to drop the charges against defendant.
Following Robinson's testimony, the state sought a motion in limine to exclude the testimony of a proposed defense witness. Defense counsel wanted to present the testimony of the defendant's aunt, who purportedly listened to the telephone conversation on a three-way line. Defense counsel represented that this witness would testify that, contrary to Eric Robinson's testimony, Robinson told defendant that he and his wife would drop the charges against defendant if defendant would pay them $1250. Defense counsel indicated that the testimony was being offered for impeachment purposes. The state argued that such testimony would constitute "extrinsic hearsay" and the trial court agreed, thus granting the state's motion in limine to exclude the testimony.
As noted, defense counsel asserted at trial that the proposed testimony was admissible for impeachment purposes. The Ohio Rules of Evidence provide for several different methods of impeachment, including impeachment to demonstrate evidence of character and conduct of a witness (Evid.R. 608), impeachment by evidence of conviction of a crime (Evid.R. 609) and impeachment by "self-contradiction" to show that a witness has made a prior statement inconsistent with his trial testimony (Evid.R. 613). Recently amended Evid.R. 616, also provides for impeachment of a witness on matters of bias, sensory or mental defect, or by specific contradiction.
For purposes of the instant action, we note in particular the provision for impeachment by specific contradiction under Evid.R. 616(C), which states:
 Facts contradicting a witness's testimony may be shown for the purpose of impeaching the witness's testimony. If offered for the sole purpose of impeaching a witness's testimony, extrinsic evidence of contradiction is inadmissible unless the evidence is one of the following:
 (1) Permitted by Evid.R. 608(A), 609, 613, 616(A), 616(B), or 706;
 (2) Permitted by the common law of impeachment and not in conflict with the Rules of Evidence.
The Staff Note to the 1998 Amendment of Evid.R. 616(C) states that "contradiction may involve the testimony of one witness that conflicts with the testimony of another witness (called `specific contradiction')." In general, a party may not introduce extrinsic evidence of contradiction on merely "collateral matters." Id. The Staff Note further provides:
 According to Wigmore, extrinsic evidence of contradiction should be admitted if the evidence would be admissible "for any purpose independently of the contradiction." 3A Wigmore, Evidence § 1003, at 961 (Chadbourn rev. 1970). Explaining this test, McCormick wrote that two types of facts were independently provable: "The first kind are facts that are relevant to the substantive issues in the case." McCormick, Evidence § 47, at 110-11 (3d ed. 1984). Because Rule 616(C) is limited to impeachment, evidence concerning the substantive issues is governed by Rules 401 to 403, not this rule." Staff Note, supra.
In the present case, as noted above, the state presented the testimony of Eric Robinson, who testified that he had spoken to the defendant by telephone and that the defendant "said that he would give half the money back, like $2,500 back, if we would drop the charges." (Tr. 112.) The defense then sought to call the defendant's aunt as a rebuttal witness. Defense counsel asserted that the prospective witness had listened to the conversation on a three-way telephone line and that she would testify that Eric Robinson said to the defendant, "if you give me $1250, we'll drop the case." (Tr. 132.)
Although the prosecution argued at trial that such testimony was inadmissible as "extrinsic hearsay," it is not clear from the record whether the prosecutor was attempting to invoke a specific evidentiary rule (e.g., Evid.R. 608(B), which prohibits extrinsic evidence to impeach by specific instances of conduct, or possibly Evid.R. 613(B), dealing with extrinsic evidence of a prior inconsistent statement). We find, however, that the evidence defendant sought to introduce to challenge Eric Robinson's account involves "specific contradiction" testimony. Impeachment by contradiction is a recognized mode of impeachment not governed by the Rules of Evidence but rather by common law principles. United States v. Perez (C.A.1, 1995), 72 F.3d 224,227. It has been held that "[a]ppropriate impeachment by contradiction includes presenting `testimony by another witness that (if credited) rebuts or undercuts or limits, or raises doubts about * * * the testimony by an earlier witness * * * even though it amounts to `extrinsic evidence.'" Boggs v. Brigano (C.A.6, 1996), 82 F.3d 417, unpublished opinion, quoting MUELLER KIRKPATRICK, Evidence § 6.58, at 662.
Further, in the instant case, the evidence proffered by defendant was not merely collateral to the case, but rather was relevant to a material issue. More specifically, Robinson's testimony that the defendant offered to give back his half of the money directly implicated defendant regarding his alleged role in the robbery. Once this evidence was presented, the proposed testimony by the defense witness would have been relevant to the case "independently of the contradiction." Staff Note, supra, citing 3A Wigmore, Evidence, § 1003, at 961. See, also, Perez,supra, at 227 (extrinsic evidence offered by defendant admissible for contradiction where "the prior testimony being contradicted was itself material to the case at hand.") As indicated by the Staff Note, Evidence Rules 401 to 403 govern evidence concerning substantive issues. In the instant action, because the statements of Eric Robinson regarding his conversation with defendant were clearly inculpatory, we conclude that the proposed contradictory testimony by the defense witness was relevant to a material issue and was therefore admissible for substantive purposes. Accordingly, the trial court abused its discretion in granting the state's motion to exclude the testimony, and we sustain defendant's second assignment of error.
In light of our disposition of the first and second assignments of error, defendant's third assignment of error, challenging his conviction based on the manifest weight of the evidence, is hereby rendered moot.
Based upon the foregoing, the first and second assignments of error are sustained, the third assignment of error is rendered moot, the judgment of the trial court is reversed and this matter is remanded to the trial court for further proceedings in accordance with law and consistent with this opinion.
Judgment reversed; and cause remanded.
BOWMAN, P.J., and TYACK, J., concur.